UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| Derek McCoy, Bobbie Graham, John Swanner, Leasa Knox, James Henderson, Lashaunda Carlo, Vincent Gaines, Ronald Inman, Danny Gandy, Rhonda Gandy, Brittanie Griffin, Ben Schexnider, Angela Dustin, Branggie Jimenez, Anita Alexander, Montel Chase, Jean-Marc Simeon, and Marc-Henry Cherival, | Civil Action No. Section    , Division District Judge Magistrate Judge |
| *plaintiffs,* | |
| versus | |
| Alacrity Adjusting Solutions, LLC, | |
| *defendant.* | |

**Complaint**
**Collective Action**
**[29 U.S.C. § 216(b)]**

Plaintiffs Derek McCoy, Bobbie Graham, John Swanner, Leasa Knox, James Henderson, Lashaunda Carlo, Vincent Gaines, Ronald Inman, Danny Gandy, Rhonda Gandy, Brittanie Griffin, Ben Schexnider, Angela Dustin, Branggie Jimenez, Anita Alexander, Montel Chase, Jean-Marc Simeon, and Marc-Henry Cherival ("Plaintiffs"), on behalf of themselves and others similarly situated, file their complaint against Defendant Alacrity Adjusting Solutions, LLC ("Alacrity") and allege as follows:

**Nature of the Claims**

1.      The Fair Labor Standards Act of 1938 ("FLSA") was enacted to eliminate both "substandard wages" and "oppressive working hours."  The FLSA specifically guarantees that covered employees receive overtime pay, at the rate of time-and-a-half, when they work more than 40 hours per week.

2.      Pursuant to *Helix Energy Solutions Group, Inc. v. Hewitt*, 143 S. Ct. 677 (2023), employees who are paid "solely on a daily rate" are entitled to overtime pay for all hours worked in excess of 40 hours in a work week.

3.    Plaintiffs bring this action, on behalf of themselves and others similarly situated, to recover liquidated damages for unpaid wages and overtime under the FLSA, 29 U.S.C. § 201, *et seq*.

4.    Plaintiffs' claims under the FLSA are brought as a collective action, pursuant to 29 U.S.C. § 216(b), on behalf of themselves and all other similarly situated persons who were/are employed by Alacrity as "Team Leads" or "Reviewers" for the period of April 8, 2020 to the final disposition of this action (the "Class Period").  Plaintiffs, and the similarly situated persons they seek to represent in this collective action, constitute the "FLSA Class."

5.    The FLSA Class members are similarly situated persons because Alacrity paid them as "day rate" employees, subjected them to the same policies, terms and conditions of employment by Alacrity, denied payment of overtime hours worked pursuant to a common policy or practice of Alacrity, and denied compensation for all hours worked pursuant to a common policy or practice of Alacrity.

### Parties and FLSA Class Definitions

6.    Plaintiff Derek McCoy is an adult citizen of the State of Mississippi and was employed as a "Team Lead" for Alacrity during the Class Period.

7.    Plaintiff Bobbie Graham is an adult citizen of the State of Texas and was employed as a "Team Lead" for Alacrity during the Class Period.

8.    Plaintiff John Swanner is an adult citizen of the State of Texas and was employed as a "Team Lead" for Alacrity during the Class Period.

9.    Plaintiff Leasa Knox is an adult citizen of the State of Texas and was employed as "Team Lead" for Alacrity during the Class Period.

10.    Plaintiff James Henderson is an adult citizen of the State of Texas and was employed as a "Team Lead" for Alacrity during the Class Period.

11.    Plaintiff Lashaunda Carlo is an adult citizen of the State of Louisiana and was employed as a "Team Lead" for Alacrity during the Class Period.

12.     Plaintiff Vincent Gaines is an adult citizen of the State of Texas and was employed as a "Team Lead" for Alacrity during the Class Period.

13.     Plaintiff Ronald Inman is an adult citizen of the State of Texas and was employed as a "Reviewer" for Alacrity during the Class Period.

14.     Plaintiff Danny Gandy is an adult citizen of the State of Oklahoma and was employed as a "Reviewer" for Alacrity during the Class Period.

15.     Plaintiff Rhonda Gandy is an adult citizen of the State of Oklahoma and was employed as a "Reviewer" for Alacrity during the Class Period.

16.     Plaintiff Brittanie Griffin is an adult citizen of the State of Texas and was employed as a "Team Lead" for Alacrity during the Class Period.

17.     Plaintiff Ben Schexnider is an adult citizen of the State of Texas and was employed as a "Team Lead" for Alacrity during the Class Period.

18.     Plaintiff Angela Dustin is an adult citizen of the State of Oklahoma and was employed as a "Team Lead" for Alacrity during the Class Period.

19.     Plaintiff Branggie Jimenez is an adult citizen of the State of Massachusetts and was employed as a "Team Lead" for Alacrity during the Class Period.

20.     Plaintiff Anita Alexander is an adult citizen of the State of Texas and was employed as a "Team Lead" for Alacrity during the Class Period.

21.     Plaintiff Montel Chase is an adult citizen of the State of Missouri and was employed as a "Team Lead" for Alacrity during the Class Period.

22.     Plaintiff Jean-Marc Simeon is an adult citizen of the State of Florida and was employed as a "Team Lead" for Alacrity during the Class Period.

23.     Plaintiff Marc-Henry Cherival is an adult citizen of the State of North Carolina and was employed as a "Team Lead" for Alacrity during the Class Period.

24.     Defendant Alacrity Adjusting Solutions, LLC is a limited liability company organized under the laws of Delaware with its principal place of business at 303 Timber Creek, Hammond, Louisiana 70403.  It may be served with process through its registered

agent, Corporation Service Company, 109 Executive Drive, Suite 3, Madison, Mississippi 39110.

25.    Upon information and belief, Alacrity's sole member is Alacrity Claims Solutions, LLC ("Alacrity Claims Solutions").  Alacrity Claims Solutions is a limited liability company organized under the laws of Delaware with its principal place of business at 9725 Windermere Boulevard, Fishers, Indiana 46037.

26.    John Doe Defendants 1 through 5 include any other defendants, whether natural or legal persons or entities, that might be identified through discovery or otherwise as responsible, jointly or severally, for the damage suffered by Plaintiffs.

27.    The FLSA Class is comprised of all "Team Leads" and "Reviewers" employed by Alacrity in its property, commercial, and automobile claims adjusting departments from April 8, 2020 through the final determination of this action.  As set forth more fully below, Alacrity paid (and pays) its Team Leads and Reviewers a "day rate" irrespective of the hours actually worked in any given day or in any given week.

28.    Plaintiffs propose the following FLSA Class definition:

> All "Team Leads" and "Reviewers" employed by Alacrity Adjusting Solutions, LLC in its property claims adjusting department, automobile claims adjusting department, and/or commercial claims adjusting department who were paid a "day rate" for work performed at any time and for any duration of employment since April 8, 2020.

### Jurisdiction and Venue

29.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action involves federal questions regarding Plaintiffs' and the FLSA Class's entitlement to full payment for all hours worked and for overtime pay for all hours worked exceeding 40 hours in a work week.

30.    This Court has personal jurisdiction over Alacrity because its principal place of business is in Louisiana, it is a citizen of Louisiana, and it is subject to general jurisdiction in Louisiana.  Moreover, because Alacrity operates its principal place of business in

Louisiana, Plaintiffs' claims for unpaid overtime wages arise from and relate to Alacrity's contacts with the forum state.

31.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Alacrity resides in this judicial district, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district, and Alacrity is subject to personal jurisdiction in this judicial district.

## General Allegations

32.     Alacrity is an independent adjuster firm in the property, commercial, and automobile insurance industry.

33.     Alacrity contracts with insurance companies.  Pursuant to those contracts, Alacrity allocates and directs its employees to perform claims adjusting services for those insurance companies in multiple locations in the United States.

34.     Among others, Alacrity employs "Reviewers" and "Team Leads."  Team Leads manage claims adjusters and perform claims adjusting services.  Reviewers review the work performed by claims adjusters.

35.     Alacrity pays its Team Leads and Reviewers a flat day rate irrespective of hours worked in a particular day or week.  Team Leads and Reviewers receive no other forms of compensation and, as wage-earning employees, they are not entitled to take business deductions for expenses they personally incur in performing work for Alacrity.

36.     Alacrity does not pay its Team Leads or Reviewers a predetermined amount of compensation, on a weekly or less frequent basis, that constitutes all or part of their compensation.  In other words, Alacrity does not pay its Team Leads or Reviewers a salary.

37.     Alacrity does not condition Plaintiffs' compensation on completion of a single job, nor do Plaintiffs' day rates depend upon the accomplishment of a single task.  Instead, Plaintiffs complete a series of jobs or tasks an indefinite number of times during the performance of their work as a Team Lead or Reviewer.

38.     Plaintiffs' day-rate compensation is predicated on the number of days worked, and nothing else.

39.     As such, the FLSA specifies that overtime compensation shall be paid to the Plaintiffs, and there are no exemptions relieving Alacrity of this legal obligation.

**a.  Plaintiff Derek McCoy**

40.     Alacrity employed McCoy as a Team Lead from October 2021 to December 2021 and from May 2022 to March 2023, for a grand total of at least 14 months (60 weeks).

41.     During the Class Period, Alacrity paid McCoy a day rate of $500 per day and, later, a day rate of $525 per day.  Day rates paid to the FLSA Class were and are substantially similar to McCoy's day rate.

42.     Alacrity paid McCoy that day rate irrespective of the number of hours McCoy actually worked on any given day or in any given week.

43.     If McCoy did not work on a particular day, Alacrity paid him nothing for that day.  If McCoy worked 12 hours on a particular day, Alacrity paid him $500 (or $525).

44.     During the Class Period, McCoy worked on average at least 75 hours per week, such that, on average, Alacrity should have paid McCoy at least 35 hours of overtime every week.

45.     During one period of employment with Alacrity, McCoy worked at least 70 days straight without a day off, and he worked a minimum of 12 hours on each of those days.

46.     The FLSA Class also regularly worked more than 40 hours per week but, like McCoy, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

47.    For a 40-hour workweek, McCoy's hourly rate of pay equals $49.00 per hour.[1]

48.    At the statutory rate of time-and-a-half, McCoy's overtime rate would equal $73.50 per hour.

49.    Over a 14-month (60-week) period, McCoy worked at least 2,100 hours for which he should have been paid overtime.  Therefore, McCoy was entitled to at least $154,350.00 in overtime wages, which Alacrity refused or failed to pay him.

### b.  Plaintiff Bobbie Graham

50.    Alacrity employed Graham as a Team Lead from mid-August 2020 to May 12, 2022, for a grand total of at least 21 months (90 weeks).

51.    During the Class Period, Alacrity paid Graham a day rate of $575 per day through and until January 7, 2022 (78 weeks), after which time Alacrity paid Graham a day rate of $525 per day (12 weeks).  Day rates paid to the FLSA Class were and are substantially similar to Graham's day rate.

52.    Alacrity paid Graham that day rate irrespective of the number of hours Graham actually worked on any given day or in any given week.

53.    If Graham did not work on a particular day, Alacrity paid her nothing for that day.  If Graham worked 12 hours on a particular day, Alacrity paid her $575 (or $525).

54.    During the Class Period, Graham worked on average at least 80 hours per week, such that, on average, Alacrity should have paid Graham at least 40 hours of overtime every week.

55.    The FLSA Class also regularly worked more than 40 hours per week but, like Graham, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

---

[1] Throughout this Complaint, hourly rates and time-and-a-half overtime rates were calculated pursuant to 29 C.F.R. § 778.112 (Day rates and job rates).

56.    For a 40-hour workweek, Graham's hourly rate of pay equals $50.31 per hour when she was paid $575 per day.  For a 40-hour workweek, Graham's hourly rate of pay equals $45.94 per hour when she was paid $525 per day.

57.    At the statutory rate of time-and-a-half, Graham's overtime rate would equal $75.47 per hour when her day rate was $575 per day, and her overtime rate would equal $68.91 per hour when her day rate was $525 per day.

58.    Over a 21-month (90-week) period, Graham worked at least 3,600 hours for which she should have been paid overtime.  Therefore, Graham was entitled to at least $235,466.40 in overtime wages during that time when her day rate was $575 per day (78 weeks) and $33,076.80 in overtime wages during that time when her day rate was $525 per day (12 weeks), for a total of $268,543.20, which Alacrity refused or failed to pay her.

**c.  John Swanner**

59.    Alacrity employed John Swanner as a Team Lead from April 8, 2020 through the filing of this action, for a grand total of 36 months (156 weeks).  Swanner remains employed by Alacrity.

60.    During the Class Period, Alacrity paid Swanner a day rate of $525 per day. Day rates paid to the FLSA Class were and are substantially similar to Swanner's day rate.

61.    Alacrity paid Swanner that day rate irrespective of the number of hours Swanner actually worked on any given day or in any given week.

62.    If Swanner did not work on a particular day, Alacrity paid him nothing for that day.  If Swanner worked 12 hours on a particular day, Alacrity paid him $525.

63.    During the Class Period, Swanner worked on average at least 75 hours per week, such that, on average, Alacrity should have paid Swanner at least 35 hours of overtime every week.

64.    The FLSA Class also regularly worked more than 40 hours per week but, like Swanner, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

65.     For a 40-hour workweek, Swanner's hourly rate of pay equals $49.00 per hour.

66.     At the statutory rate of time-and-a-half, Swanner's overtime rate would equal $73.50 per hour.

67.     Over a 36-month (156-week) period, Swanner worked at least 5,460 hours for which he should have been paid overtime.  Therefore, Swanner was entitled to at least $401,310.00 in overtime wages, which Alacrity refused or failed to pay him.

68.     Further, as a Team Lead currently employed by Alacrity, Swanner is entitled to overtime for all hours in excess of 40 hours worked in any particular work week from the filing of this action.

### d.  Leasa Knox

69.     Alacrity employed Leasa Knox as a Team Lead from April 8, 2020 until approximately November 1, 2022, for a grand total of 31 months (132 weeks).

70.     During the Class Period, Alacrity paid Knox a day rate of $525 per day.  Day rates paid to the FLSA Class were and are substantially similar to Knox's day rate.

71.     Alacrity paid Knox that day rate irrespective of the number of hours Knox actually worked on any given day or in any given week.

72.     If Knox did not work on a particular day, Alacrity paid her nothing for that day.  If Knox worked 12 hours on a particular day, Alacrity paid her $525.

73.     During the Class Period, Knox worked on average at least 112 hours per week, such that, on average, Alacrity should have paid Knox at least 72 hours of overtime every week.

74.     The FLSA Class also regularly worked more than 40 hours per week but, like Knox, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

75.     For a 40-hour workweek, Knox's hourly rate of pay equals $49.00 per hour.

76. At the statutory rate of time-and-a-half, Knox's overtime rate would equal $73.50 per hour.

77. Over a 31-month (132-week) period, Knox worked at least 9,000 hours for which she should have been paid overtime. Therefore, Knox was entitled to at least $698,544.00 in overtime wages, which Alacrity refused or failed to pay her.

**e. James Henderson**

78. Alacrity employed James Henderson as a Team Lead from July 15, 2020 to October 15, 2020 (13 weeks), from May 19, 2021 to February 1, 2022 (36 weeks), and from May 1, 2022 to October 1, 2022 (21 weeks), for a grand total of 70 weeks.

79. During the Class Period, Alacrity paid Henderson a day rate of $540 per day between July 15, 2020 and February 1, 2022 (49 weeks), and a day rate of $500 per day from May 1, 2022 to October 1, 2022 (21 weeks).

80. Alacrity paid Henderson those day rates irrespective of the number of hours Henderson actually worked on any given day or in any given week.

81. If Henderson did not work on a particular day, Alacrity paid him nothing for that day. If Henderson worked 12 hours on a particular day, Alacrity paid him $540 (or $500).

82. During the Class Period, Henderson worked on average at least 85 hours per week, such that, on average, Alacrity should have paid Henderson at least 45 hours of overtime every week.

83. The FLSA Class also regularly worked more than 40 hours per week but, like Henderson, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

84. For a 40-hour workweek, Henderson's hourly rate of pay equals $44.47 per hour when his rate was $540 per day, and $41.18 when his rate was $500 per day.

85. At the statutory rate of time-and-a-half, Henderson's overtime rate would equal $66.71 when his rate was $540 per day, and $61.77 when his rate was $500 per day.

86.     Over a 70-week period, Henderson worked at least 3,150 hours for which he should have been paid overtime.  Therefore, Henderson was entitled to at least $147,095.55 in overtime wages during that time when his day rate was $540 per day (49 weeks), and Henderson was entitled to at least $58,372.65 in overtime wages during that time when his day rate was $500 per day (21 weeks), for a total of $205,468.20, which Alacrity refused or failed to pay him.

### f.  Lashaunda Carlo

87.     Alacrity employed Lashaunda Carlo as a Team Lead from mid-July 2021 until mid-January 2022, for a grand total of over six months (30 weeks).

88.     During the Class Period, Alacrity paid Carlo a day rate of $580 per day.  Day rates paid to the FLSA Class were and are substantially similar to Carlo's day rate.

89.     Alacrity paid Carlo that day rate irrespective of the number of hours Carlo actually worked on any given day or in any given week.

90.     If Carlo did not work on a particular day, Alacrity paid her nothing for that day. (In fact, when Carlo was absent from work due to the death of her brother and her illness from a COVID-19 infection, Alacrity paid her nothing.)  If Carlo worked 12 hours on a particular day, Alacrity paid her $580.

91.     During the Class Period, Carlo worked on average at least 84 hours per week, such that, on average, Alacrity should have paid Carlo at least 44 hours of overtime every week.

92.     The FLSA Class also regularly worked more than 40 hours per week but, like Carlo, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

93.     For a 40-hour workweek, Carlo's hourly rate of pay equals $48.33 per hour.

94.     At the statutory rate of time-and-a-half, Carlo's overtime rate would equal $72.50 per hour.

95.    Over a 6-month (30-week) period, Carlo worked at least 1,320 hours for which she should have been paid overtime.  Therefore, Carlo was entitled to at least $95,700.00 in overtime wages, which Alacrity refused or failed to pay her.

### g.  Vincent Gaines

96.    Alacrity employed Vincent Gaines as a Team Lead from April 1, 2021 to September 30, 2022, for a grand total of 18 months (77 weeks).

97.    During the Class Period, Alacrity paid Gaines a day rate of $550 per day. Day rates paid to the FLSA Class were and are substantially similar to Gaines' day rate.

98.    Alacrity paid Gaines that day rate irrespective of the number of hours Gaines actually worked on any given day or in any given week.

99.    If Gaines did not work on a particular day, Alacrity paid him nothing for that day.  If Gaines worked 12 hours on a particular day, Alacrity paid him $550.

100.    During the Class Period, Gaines worked on average at least 70 hours per week, such that, on average, Alacrity should have paid Gaines at least 30 hours of overtime every week.

101.    The FLSA Class also regularly worked more than 40 hours per week but, like Gaines, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

102.    For a 40-hour workweek, Gaines' hourly rate of pay equals $55.00 per hour.

103.    At the statutory rate of time-and-a-half, Gaines' overtime rate would equal $82.50 per hour.

104.    Over an 18-month (77-week) period, Gaines worked at least 2,310 hours for which he should have been paid overtime.  Therefore, Gaines was entitled to at least $190,575.00 in overtime wages, which Alacrity refused or failed to pay him.

### h.  Ronald Inman

105.    Alacrity has employed Ronald Inman as a Reviewer from June 2021 to present, for a grand total of 22 months (94 weeks).

106.    During the Class Period, Alacrity paid Inman a day rate of $520 per day and, at other times, a day rate of $575 per day.  Day rates paid to the FLSA Class were and are substantially similar to Inman's day rates.

107.    Alacrity paid Inman a day rate of $520 for approximately 63 weeks, and Alacrity paid Inman a day rate of $575 for approximately 31 weeks.

108.    Alacrity paid Inman that day rate irrespective of the number of hours Inman actually worked on any given day or in any given week.

109.    If Inman did not work on a particular day, Alacrity paid him nothing for that day.  If Inman worked 12 hours on a particular day, Alacrity paid him $520 (or $575).

110.    During the Class Period, Inman worked on average at least 60 hours per week such that, on average, Alacrity should have paid Inman at least 20 hours of overtime every week.

111.    The FLSA Class also regularly worked more than 40 hours per week but, like Inman, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

112.    For a 40-hour workweek, Inman's hourly rate equals $60.67 per hour when he was paid a day rate of $520, and $67.08 per hour when he was paid a day rate of $575.

113.    At the statutory rate of time-and-a-half, Inman's overtime rate would equal $91.01 per hour when he was paid a day rate of $520, and $100.62 when he was paid a day rate of $575.

114.    Over a 22-month (94-week) period, Inman worked at least 1,880 hours for which he should have been paid overtime.  Therefore, Inman was entitled to at least $114,672.60 in overtime wages during that time when his day rate was $520 per day (63 weeks), and Inman was entitled to at least $62,384.40 in overtime wages during that time when his day rate was $575 per day (31 weeks), for a total of $177,057.00, which Alacrity refused or failed to pay him.

115.    Further, as a Reviewer currently employed by Alacrity, Inman is entitled to overtime for all hours in excess of 40 hours worked in any particular work week from the filing of this action.

> **i. Danny Gandy**

116.    Alacrity employed Danny Gandy as a Reviewer from May 2021 to December 2021, for a grand total of 8 months (34 weeks).

117.    During the Class Period, Alacrity paid Gandy a day rate of $350 per day between May 2021 and September 30, 2021 and again between November 1, 2021 and December 31, 2021 (30 weeks), and a day rate of $450 per day between October 1, 2021 and October 31, 2021 (4 weeks).  Day rates paid to the FLSA Class were and are substantially similar to Gandy's day rates.

118.    Alacrity paid Gandy that day rate irrespective of the number of hours he actually worked on any given day or in any given week.

119.    If Gandy did not work on a particular day, Alacrity paid him nothing for that day.  If Gandy worked 12 hours on a particular day, Alacrity paid him $350 (or $450).

120.    During the Class Period, Gandy worked on average at least 84 hours per week such that, on average, Alacrity should have paid Gandy at least 44 hours of overtime every week.

121.    The FLSA Class also regularly worked more than 40 hours per week but, like Gandy, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

122.    For a 40-hour workweek, Gandy's hourly rate equals $29.17 per hour when he was paid a day rate of $350, and $37.50 per hour when he was paid a day rate of $450.

123.    At the statutory rate of time-and-a-half, Gandy's overtime rate would equal $43.76 per hour when he was paid a day rate of $350, and $56.25 when he was paid a day rate of $450.

124.    Over an 8-month (34-week) period, Gandy worked at least 1,496 hours for which he should have been paid overtime.  Therefore, Gandy was entitled to at least $57,763.20 in overtime wages during that time when his day rate was $350 per day (30 weeks), and Gandy was entitled to at least $9,900.00 in overtime wages during that time when his day rate was $450 per day (4 weeks), for a total of $67,663.20, which Alacrity refused or failed to pay him.

**j.    Rhonda Gandy**

125.    Alacrity employed Rhonda Gandy as a Reviewer from May 2021 to December 2021, for a grand total of 8 months (34 weeks).

126.    During the Class Period, Alacrity paid Gandy a day rate of $350 per day between May 2021 and September 30, 2021 and again between November 1, 2021 and December 31, 2021 (30 weeks), and a day rate of $450 per day between October 1, 2021 and October 31, 2021 (4 weeks).  Day rates paid to the FLSA Class were and are substantially similar to Gandy's day rates.

127.    Alacrity paid Gandy that day rate irrespective of the number of hours she actually worked on any given day or in any given week.

128.    If Gandy did not work on a particular day, Alacrity paid her nothing for that day.  If Gandy worked 12 hours on a particular day, Alacrity paid her $350 (or $450).

129.    During the Class Period, Gandy worked on average at least 84 hours per week such that, on average, Alacrity should have paid Gandy at least 44 hours of overtime every week.

130.    The FLSA Class also regularly worked more than 40 hours per week but, like Gandy, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

131.    For a 40-hour workweek, Gandy's hourly rate equals $29.17 per hour when she was paid a day rate of $350, and $37.50 per hour when she was paid a day rate of $450.

132.    At the statutory rate of time-and-a-half, Gandy's overtime rate would equal $43.76 per hour when she was paid a day rate of $350, and $56.25 when she was paid a day rate of $450.

133.    Over an 8-month (34-week) period, Gandy worked at least 1,496 hours for which she should have been paid overtime.  Therefore, Gandy was entitled to at least $57,763.20 in overtime wages during that time when her day rate was $350 per day (30 weeks), and Gandy was entitled to at least $9,900.00 in overtime wages during that time when her day rate was $450 per day (4 weeks), for a total of $67,663.20, which Alacrity refused or failed to pay her.

### l. Brittanie Griffin

134.    Alacrity employed Brittanie Griffin as a Team Lead from August 2021 to May 2022, for a grand total of 10 months (44 weeks).

135.    During the Class Period, Alacrity paid Griffin a day rate of $475 per day and, at other times, a day rate of $450 per day.  Day rates paid to the FLSA Class were and are substantially similar to Griffin's day rates.

136.    Alacrity paid Griffin a day rate of $475 for approximately 33 weeks, and Alacrity paid Griffin a day rate of $450 for approximately 11 weeks.

137.    Alacrity paid Griffin that day rate irrespective of the number of hours Griffin actually worked on any given day or in any given week.

138.    If Griffin did not work on a particular day, Alacrity paid her nothing for that day.  If Griffin worked 12 hours on a particular day, Alacrity paid her $475 (or $450).

139.    During the Class Period, Griffin worked on average at least 84 hours per week such that, on average, Alacrity should have paid Griffin at least 44 hours of overtime every week.

140.    The FLSA Class also regularly worked more than 40 hours per week but, like Griffin, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

141.    For a 40-hour workweek, Griffin's hourly rate equals $39.58 per hour when she was paid a day rate of $475, and $37.50 per hour when she was paid a day rate of $450.

142.    At the statutory rate of time-and-a-half, Griffin's rate would equal $59.37 per hour when she was paid a day rate of $475, and $56.25 when she was paid a day rate of $450.

143.    Over a 10-month (44-week) period, Griffin worked at least 1,936 hours for which she should have been paid overtime.  Therefore, Griffin was entitled to at least $86,205.24 in overtime wages during that time when her day rate was $475 per day (33 weeks), and Griffin was entitled to at least $27,225.00 in overtime wages during that time when her day rate was $450 per day (11 weeks), for a total of $113,430.24, which Alacrity refused or failed to pay her.

### m. Ben Schexnider

144.    Alacrity employed Ben Schexnider as a Team Lead from April 8, 2020 to present, for a grand total of 36 months (156 weeks).

145.    During the Class Period, Alacrity paid Schexnider a day rate of $650 per day from April 8, 2020 to January 31, 2022 (103 weeks), and a day rate of $525 per day from February 1, 2022 to present (53 weeks).

146.    Alacrity paid Schexnider that day rate irrespective of the number of hours Schexnider actually worked on any given day or in any given week.

147.    If Schexnider did not work on a particular day, Alacrity paid him nothing for that day.  If Schexnider worked 12 hours on a particular day, Alacrity paid him $650 (or $525).

148.    During the Class Period, Schexnider worked on average at least 70 hours per week such that, on average, Alacrity should have paid Schexnider at least 30 hours of over-time every week.

149.    The FLSA Class also regularly worked more than 40 hours per week but, like Schexnider, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

150.    For a 40-hour workweek, Schexnider's hourly rate equals $65.00 per hour when he was paid a day rate of $650, and $52.50 per hour when he was paid a day rate of $525.

151.    At the statutory rate of time-and-a-half, Schexnider's rate would equal $97.50 per hour when he was paid a day rate of $650, and $78.75 per hour when he was paid a day rate of $525.

152.    Over a 36-month (156-week) period, Schexnider worked at least 4,680 hours for which he should have been paid overtime.  Therefore, Schexnider was entitled to at least $301,275.00 in overtime wages during that time when his day rate was $650 per day (103 weeks), and Schexnider was entitled to at least $125,212.50 in overtime wages during that time when his day rate was $525 per day (53 weeks), for a total of $426,487.50, which Alacrity refused or failed to pay him.  Further, as a currently employee paid on a daily rate, Schexnider is entitled to all overtime compensation earned but not paid from the filing of this complaint.

**n. Angela Dustin**

153.    Alacrity employed Angela Dustin as a Team Lead from April 2020 to present, for a grand total of 36 months (156 weeks).

154.    During the Class Period, Alacrity paid Dustin a day rate of $525 per day.

155.    Alacrity paid Dustin that day rate irrespective of the number of hours Dustin actually worked on any given day or in any given week.

156.    If Dustin did not work on a particular day, Alacrity paid her nothing for that day. If Dustin worked 12 hours on a particular day, Alacrity paid her $525.

157.    From April 2020 to December 2021, Dustin worked on average at least 60 hours per week, such that, on average, Alacrity should have paid Dustin at least 20 hours

of overtime each week in that time-period. From December 2021 to present, Dustin worked on average at least 50 hours per week, such that, on average, Alacrity should have paid Dustin at least 10 hours of overtime each week in that time-period.

158.    The FLSA Class also regularly worked more than 40 hours per week but, like Dustin, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

159.    For a 40-hour workweek, Dustin's rate equals $61.25 per hour when she was paid at a day rate of $525.

160.    At the statutory rate of time-and-a-half, Dustin's rate would equal $91.88 per hour when she was paid at a day rate of $525.

161.    From April 2020 to December 2021 (a 32-week period), Dustin worked at least 640 hours for which she should have been paid overtime. From December 2021 to present (a 68-week period), Dustin worked at least 680 hours for which she should have been paid overtime. Therefore, Dustin was entitled to at least $121,281.60 in overtime wages during those time-periods when her day rate was $525 per day, which Alacrity refused or failed to pay her. Further, as a current employee paid a daily rate, Dustin is entitled to all overtime compensation earned but not paid from the filing of this complaint.

**o.  Branggie Jimenez**

162.    Alacrity employed Branggie Jimenez as a Team Lead from June 1, 2022 to present, for a grand total of 10 months (44 weeks).

163.    During the Class Period, Alacrity paid Jimenez a day rate of $500 per day.

164.    Alacrity paid Jimenez that day rate irrespective of the number of hours Jimenez actually worked on any given day or in any given week.

165.    If Jimenez did not work on a particular day, Alacrity paid him nothing for that day. If Jimenez worked 12 hours on a particular day, Alacrity paid him $500.

166.    From June 1, 2022 to present, Jimenez worked on average at least 77 hours per week, such that, on average, Alacrity should have paid Jimenez at least 37 hours of overtime each week in that time period.

167.    The FLSA Class also regularly worked more than 40 hours per week but, like Jimenez, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

168.    For a 40-hour workweek, Jimenez's rate equals $50 per hour when he was paid at a day rate of $500.

169.    At the statutory rate of time-and-a-half, Jimenez's rate would equal $75 per hour when he was paid at a day rate of $500.

170.    From June 1, 2022 to present (a 44-week period), Jimenez worked at least 1,628 hours for which he should have been paid overtime. Therefore, Jimenez was entitled to at least $122,100 in overtime wages during those time-periods when his day rate was $500 per day, which Alacrity refused or failed to pay him. Further, as a current employee paid a daily rate, Jimenez is entitled to all overtime compensation earned but not paid from the filing of this complaint.

### p. Anita Alexander

171.    Alacrity employed Anita Alexander as a Team Lead from August 1, 2021 to February 1, 2022 (26 weeks) and again from March 1, 2022 to September 1, 2022 (26 weeks) , for a grand total of 12 months (52 weeks).

172.    During the Class Period, Alacrity paid Alexander a day rate of $550 per day between August and February 2022, and Alacrity paid Alexander a day rate of $500 per day between March and September 2022.

173.    Alacrity paid Alexander those day rates irrespective of the number of hours Alexander actually worked on any given day or in any given week.

174.    If Alexander did not work on a particular day, Alacrity paid her nothing for that day. If Alexander worked 12 hours on a particular day, Alacrity paid her $550 (or $500).

175.    From August 1, 2021 to September 1, 2022, Alexander worked on average at least 84 hours per week, such that, on average, Alacrity should have paid Alexander at least 44 hours of overtime each week in that time period.

176.    The FLSA Class also regularly worked more than 40 hours per week but, like Alexander, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

177.    For a 40-hour workweek, Alexander's rate equals $45.83 per hour when she was paid a day rate of $550, and Alexander's rate equals $41.67 per hour when she was paid at a day rate of $500.

178.    At the statutory rate of time-and-a-half, Alexander's rate would equal $68.75 per hour when she was paid at a day rate of $550, and Alexander's rate would equal $62.51 per hour when she was paid a day rate of $500.

179.    From August 1, 2021 to September 1, 2022 (a 52-week period), Alexander worked at least 2,288 hours for which she should have been paid overtime. Therefore, Alexander was entitled to at least $78,650 in overtime wages during those time-periods when her day rate was $550 per day (26 weeks), and Alexander was entitled to at least $71,511.44 in overtime wages during those periods when her day rate was $500 per day (26 weeks), for a total of $150,161.44, which Alacrity refused or failed to pay her. Further, as a current employee paid a daily rate, Alexander is entitled to all overtime compensation earned but not paid from the filing of this complaint.

q. **Montel Chase**

180.    Alacrity employed Montel Chase as a Team Lead from August 1, 2020 to present, for a grand total of 32 months (140 weeks).

181.     During the Class Period, Alacrity paid Chase a day rate of $450 (7 weeks), $500 (126 weeks), and $540 (7 weeks) between August 1, 2020 and present.

182.     Alacrity paid Chase those day rates irrespective of the number of hours Chase actually worked on any given day or in any given week.

183.     If Chase did not work on a particular day, Alacrity paid him nothing for that day. If Chase worked 12 hours on a particular day, Alacrity paid her $550 (or $450 or $540).

184.     From August 1, 2020 to present, Chase worked on average at least 70 hours per week, such that, on average, Alacrity should have paid Chase at least 30 hours of over-time each week in that time period.

185.     The FLSA Class also regularly worked more than 40 hours per week but, like Chase, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

186.     For a 40-hour workweek, Chase's rate equals $45 per hour when he was paid a day rate of $450, Chase's rate equals $50 per hour when he was paid at a day rate of $500, and Chase's rate equals $54 per hour when he was paid at a day rate of $540.

187.     At the statutory rate of time-and-a-half, Chase's rate would equal $67.50 per hour when he was paid at a day rate of $450, Chase's rate would equal $75 per hour when he was paid a day rate of $500, and Chase's rate would equal $81 per hour when he was paid a day rate of $540.

188.     From August 1, 2020 to present (a 140-week period), Chase worked at least 4,200 hours for which he should have been paid overtime. Therefore, Chase was entitled to at least $14,175 in overtime wages during those time-periods when his day rate was $450 per day (7 weeks), Chase was entitled to at least $283,500 in overtime wages during those periods when his day rate was $500 per day (126 weeks), and Chase was entitled to at least $17,010 in overtime wages during those periods when his day rate was $540 per day (7 weeks), for a total of $314,685, which Alacrity refused or failed to pay him. Further, as a

current employee paid a daily rate, Chase is entitled to all overtime compensation earned but not paid from the filing of this complaint.

       **r.  Jean-Marc Simeon**

189.    Alacrity employed Jean-Marc Simeon as a Team Lead from August 1, 2021 to January 31, 2022, for a grand total of six months (24 weeks).

190.    During the Class Period, Alacrity paid Simeon a day rate of $450 per day (4 weeks) in August 2021 and, thereafter, $520 per day (20 weeks).

191.    Alacrity paid Simeon that day rate irrespective of the number of hours Simeon actually worked on any given day or in any given week.

192.    If Simeon did not work on a particular day, Alacrity paid him nothing for that day. If Simeon worked 12 hours on a particular day, Alacrity paid him $520 (or $450).

193.    From August 1, 2021 to January 31, 2022, Simeon worked on average at least 84 hours per week, such that, on average, Alacrity should have paid Simeon at least 44 hours of overtime each week in that time period.

194.    The FLSA Class also regularly worked more than 40 hours per week but, like Simeon, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

195.    For a 40-hour workweek, Simeon's rate equals $37.50 per hour when he was paid at a day rate of $450, and $43.33 when he was paid at a day rate of $520.

196.    At the statutory rate of time-and-a-half, Simeon's rate would equal $56.25 per hour when he was paid at a day rate of $450, and $65 when he was paid a day rate of $520.

197.    From August 1, 2021 to January 31, 2022 (a 24-week period), Simeon worked at least 1,056 hours for which he should have been paid overtime. Therefore, Simeon was entitled to at least $9,900 in overtime wages when his day rate was $450 per day (4 weeks) and $57,200 in overtime wages when his day rate was $520 per day, for a total of $67,100, which Alacrity refused or failed to pay him.

s. **Marc-Henry Cherival**

198.    Alacrity employed Marc-Henry Cherival as a Team Lead from November 1, 2021 to April 30, 2022, for a grand total of six months (24 weeks).

199.    During the Class Period, Alacrity paid Cherival a day rate of $575 per day.

200.    Alacrity paid Cherival that day rate irrespective of the number of hours Cherival actually worked on any given day or in any given week.

201.    If Cherival did not work on a particular day, Alacrity paid him nothing for that day. If Cherival worked 12 hours on a particular day, Alacrity paid him $575.

202.    From November 1, 2021 to April 30, 2022, Cherival worked on average at least 105 hours per week, such that, on average, Alacrity should have paid Cherival at least 65 hours of overtime each week in that time period.

203.    The FLSA Class also regularly worked more than 40 hours per week but, like Cherival, were paid only a day rate irrespective of hours actually worked and were not paid overtime.

204.    For a 40-hour workweek, Cherival's rate equals $38.33 per hour when he was paid at a day rate of $575.

205.    At the statutory rate of time-and-a-half, Cherival's rate would equal $57.50 per hour when he was paid at a day rate of $575.

206.    From November 1, 2021 to April 30, 2022 (a 24-week period), Cherival worked at least 1,560 hours for which he should have been paid overtime. Therefore, Cherival was entitled to at least $89,700 in overtime wages during those time-periods when his day rate was $575 per day, which Alacrity refused or failed to pay him.

## FLSA Collective Action Allegations

207.    Plaintiffs bring their FLSA claim as a collective action on behalf of themselves and all other similarly situated persons who are/were employed by Alacrity as Team Leads or Reviewers in its property, commercial, and automobile claims adjusting departments.

208.    The basic job duties of the FLSA Class were/are the same or substantially similar to those of Plaintiffs, and the members of the FLSA Class were/are paid in the same manner and under the same terms and conditions, common policies, plans, and practices as Plaintiffs.

209.    The FLSA Class, like Plaintiffs, have been subject to the same unlawful policies, plans and practices of Alacrity, including paying the FLSA Class a day rate without regard to number of hours actually worked in a day or in a week and by failing to pay the FLSA Class overtime wages.

210.    During the Class Period, Alacrity was aware of its obligations under the FLSA and knowingly refused and failed to pay its Team Leads overtime wages.

211.    During the Class Period, Plaintiffs and FLSA Class members were employees under the FLSA, 28 U.S.C. § 203(e).

212.    During the Class Period, Alacrity was a covered employer under the FLSA, 29 U.S.C. § 203(d).

213.    In each of the past three years, Alacrity has been an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s)(l) of the FLSA, 29 U.S.C. § 203(s)(1), in that Alacrity has had employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person and Alacrity has had and continues to have annual gross volume of sales made or business done in excess of $500,000, exclusive of excise taxes at the retail level which are separately stated.

214.    Alacrity has, during the Class Period, been an enterprise within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r).

215.    Plaintiffs were never exempt from overtime under the FLSA while employed as Team Leads or Reviewers.

216.    The FLSA Class members were never exempt from overtime under the FLSA while employed as Team Leads or Reviewers.

217.    During the Class Period, Plaintiffs and the FLSA Class members routinely worked more than 40 hours per week, and Alacrity knew that.

218.    Alacrity was aware of its obligations under the FLSA because, among other things, the Court of Appeals for the Fifth Circuit decided *Helix* in December 2020, which clearly and unambiguously held that employees who were paid a day rate were entitled to overtime wages.  Nevertheless, Alacrity persisted in undercompensating the FLSA Class, failed to true up any earned but unpaid wages, and continued—and continues to this day— to pay the FLSA Class on a daily rate without compensating the FLSA Class for overtime wages.

219.    As a result of Alacrity's conduct alleged here, it violated 29 U.S.C. § 207 by failing to pay Plaintiffs and the FLSA Class for overtime wages at the rate of time-and-a-half for all hours worked in excess of 40 hours during a work week.

220.    Alacrity's violations of the FLSA were willful, repeated, knowing, intentional and without a good faith basis, and they significantly damaged Plaintiffs and the FLSA Class.

221.    As a result of its conduct, Alacrity is liable to Plaintiffs and the FLSA Class for the full amount of their unpaid wages, including liquidated damages and attorneys' fees and costs incurred by Plaintiffs and the FLSA Class in pursuing this action.

222.    The FLSA Class is comprised of at least 26 Team Leads and Reviewers in Alacrity's property claims adjusting department and at least that many Team Leads and Reviewers in Alacrity's automobile and commercial claims adjusting departments.  The actual number could be greater.

223.    Accordingly, Alacrity should be required to provide Plaintiffs with a list of all persons employed by Alacrity as Team Leads and Reviewers in all claims adjusting departments during the Class Period, along with their last known address, telephone numbers, and email addresses so Plaintiffs and their counsel may provide the FLSA Class notice of

this action and an opportunity to make an informed decision about whether to participate in this FLSA Collective Action.

### Count One:
### Failure to Pay Overtime
### 29 U.S.C. § 207

224.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

225.    The FLSA requires covered employers, such as Alacrity, to pay all non-exempt employees at a rate of not less than one and one-half times their regular rate of pay for all hours worked in excess of 40 hours per work week.

226.    Alacrity did not pay Plaintiffs and the FLSA Class for all hours worked, including for hours that exceeded 40 hours per work week.

227.    Plaintiffs and the FLSA Class were not and are not exempt from the provisions of the FLSA.

228.    Plaintiffs and the FLSA Class were employees of Alacrity during the Class Period.

229.    Alacrity's violations of the FSLA, including its failure to pay Plaintiffs and the FLSA Class for overtime hours worked, were both knowing and willful within the meaning of the FLSA—particularly because, among other things, the Court of Appeals for the Fifth Circuit held in December 2020 that employees paid a daily rate are entitled to overtime wages for all hours worked in excess of 40 hours in a work week. *See Helix*, 983 F.3d 789 (5th Cir. 2020); *see also Helix*, 15 F.4th 289 (5th Cir. 2021) (en banc), *aff'd by Helix*, 143 S. Ct. 677 (2023).

230.    Alacrity's violations of the FLSA have significantly damaged Plaintiffs and the FLSA Class and entitle them to recover the total amount of their unpaid wages and overtime wages, including an additional amount in liquidated damages, attorneys' fees, and costs incurred in prosecuting this action.

## Prayer for Relief

231.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

232.    As a direct and proximate result of Alacrity's knowing and willful violations of the FLSA, Plaintiffs and the FLSA Class have been damaged and are entitled to relief as follows:

      a.    An award of amounts equal to the number of overtime hours worked during the Class Period, multiplied by one and one-half times the calculated hourly rate, for Plaintiffs and each member of the FLSA Class, plus pre- and post-judgment interest;

      b.    An award of liquidated damages equal to the total amount of unpaid overtime wages because Alacrity's violations were willful and/or without a good faith basis;

      c.    An award of reasonable attorneys' fees, plus costs and expenses, incurred in prosecuting this action;

      d.    A declaration that this action be maintained as a collective action pursuant to 29 U.S.C. § 216;

      e.    An order requiring Alacrity to provide Plaintiffs and their counsel with a list of all persons who were/are engaged by Alacrity as Team Leads or Reviewers in all claims adjusting departments during the Class Period, including all last known addresses, telephone numbers, and email addresses so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it; and

      f.    Award any additional relief and damages permitted by the law and/or deemed just and proper by this Court.

## Jury Demand

233.    Plaintiffs demand a jury on all issues so triable.

Respectfully submitted,

/s/ Andrew T. Lilly

**Andrew T. Lilly (La. 32559)**
Lilly PLLC
4907 Magazine Street
New Orleans, Louisiana 70115
t: (504) 812-6388
e: andrew@atlpllc.com

***Attorney for Plaintiffs***